**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ANTONIO L. BUCKMAN,

        Plaintiff,

v.                                  Case No. 3:13-cv-872-J-32JRK

RONNIE MORRIS, et al.,

        Defendants.

_____

## ORDER

The Plaintiff prisoner, Antonio Buckman, says that prison guards used excessive force when they extracted him from his cell. The guards deny his allegations. The entire incident was videotaped. The video "obviously contradicts" Plaintiff's version of events. Therefore, summary judgment in favor of Defendants is due to be granted.

## I.  Status

Plaintiff, an inmate of the Florida penal system, initiated this case by filing a pro se Civil Rights Complaint (Doc. 1) pursuant to 42 U.S.C. § 1983. He is currently proceeding on an Amended Complaint (Doc. 8) (Amended Complaint), in which he names the following Defendants: Sergeant Ronnie Morris; Sergeant Brandon W. Woods; Officer J. Oliveros; Sergeant K. Porr; Sergeant J. Anderson; Captain George R. Hanson; and Lieutenant John McSpadden. At the time of the incident alleged in the Amended Complaint, the Defendants were employed by the Florida Department of Corrections (FDOC) at Florida State Prison (FSP). Plaintiff lists his claims as excessive use of force; failure to intervene and protect; assault and battery; retaliation; and conspiracy to obstruct justice. Plaintiff requests declaratory and injunctive relief, as well as monetary damages.

Before the Court is Defendants' Motion for Summary Judgment (Doc. 42) (Motion), including exhibits.[1]  The exhibits include Plaintiff's FDOC face sheet (Ex. A); a use of force packet relating to the incident alleged in the Amended Complaint (Ex. B); a Declaration from Defendant Hanson (Ex. C); a portion of Plaintiff's deposition (Ex. D); a list of Plaintiff's disciplinary actions (Ex. E); and Declarations from Defendants Woods (Ex. G), Morris (Doc. 60-1), Poor (Doc. 60-2), Anderson (Ex. J), and McSpadden (Doc. 61).  The Court previously advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment may foreclose subsequent litigation on the matter, and gave him an opportunity to file a response to Defendants' Motion.  See Order (Doc. 12).  Plaintiff filed a Response and Declaration in Opposition to the Defendants' Motion for Summary Judgment (Doc. 56) (Response), including exhibits.

## II.  Summary of Parties' Pertinent Filings

### A.  Plaintiff's Amended Complaint[2]

On May 7, 2013, Plaintiff was housed at FSP "as a maximum management inmate." Amended Complaint at 8. At about 8:45 p.m., an unknown officer directed Plaintiff to submit to a strip search that included bending at the waist and spreading his buttocks. Id. at 8, 13. Plaintiff refused to comply. Id. at 13.  Plaintiff was told that if he did not comply, he would

---

[1] The exhibits attached to the Motion are cited as "Ex."  Some of the exhibits would not open on the Court's CM/ECF system, so the Declarations of Defendants Morris, Porr, and McSpadden were refiled and citations will be to their document numbers as refiled.  See Docs. 60-61.

[2] The Court credits the specific facts pled in Plaintiff's sworn Amended Complaint when considering the summary judgment Motion.  See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014) (citations omitted).

be gassed.  Id.  Knowing that he would be gassed for failing to comply, Plaintiff "started packing his property in a sheet to prevent the chemical agents from destroying his property." Id. at 14.  "As Plaintiff attempted to pick his property off the floor, [he] experienced a sharp pain in his lower back that caused him to fall to the floor and lay there."  Id.  Plaintiff attempted to stand up, but he was unable to do so.  Id.  Plaintiff told the other inmates on his wing to yell "that a man was down."  Id.  Plaintiff attempted to stand up again, but he was in such "extreme pain" that he lost consciousness.  Id.

Upon finding Plaintiff unresponsive in his cell, Defendant Hanson assembled the A-team[3] and requested that medical staff come to Plaintiff's cell.  Id.  The A-team entered Plaintiff's cell and "intentionally hit Plaintiff in the face with the shield while Plaintiff was still in an unconscious state on the floor."  Id. at 15.  Plaintiff awoke and saw Defendant "Morris move the shield below Plaintiff's chin."  Id.  Defendants Morris and Woods punched Plaintiff in the face multiple times, while Defendants Oliveros, Porr, and Anderson also assaulted Plaintiff.  Id.  Defendant Woods punched Plaintiff with a closed fist with such force that it knocked out one of Plaintiff's teeth.  Id.  Defendants continued to punch and kick Plaintiff in his "head and side of the face."  Id.  Plaintiff was eventually turned onto his stomach and restrained. Id. at 16.  Even after being restrained, Defendants Woods and Morris "continued to take cheap punches at Plaintiff's head."  Id. at 16.  Plaintiff was lifted to his feet and escorted to medical.  Id.  As a result of the force used, Plaintiff suffered the following injuries: "(1) emotional pain; (2) humiliation and embarrassment; (3) a negative attitude towards all

_____

[3] Plaintiff refers to the team of correctional officers who entered his cell to extract him as the "A-team."  Defendants refer to it as the Alpha Team, the Alpha One Response Team, or the Alpha Response Team.

3

correctional officers; (4) multiple abrasions to the face and head; (5) a bloody, swelled nose; (6) one missing front tooth; (7) two badly chipped front teeth[]; (8) a top busted lip; (9) a badly busted bottom lip which required 12 stitches inside and outside; (10) deprivation of sleep due to nightmares of the assault and pain; (11) constant painful headaches; (12) always biting [his] own bottom lip; (13) constant swelling of the gums with pain; and (14) a cracked tooth." Id. at 19.

Plaintiff contends that while the A-team was in his cell, he did not resist or disobey any order.  Id.  Based on the preceding factual allegations, Plaintiff raises the following claims: (1) Defendants Morris, Woods, Anderson, Porr, and Oliveros used excessive force on him; (2) Defendants Oliveros, Anderson, and Porr failed to intervene in and failed to protect Plaintiff from the use of excessive force by Defendants Morris and Woods; (3)  Defendants McSpadden and Hanson failed to intervene in and failed to protect Plaintiff from the use of excessive force by the other Defendants; (4) the use of excessive force by Defendants Morris, Woods, Oliveros, Anderson, and Porr also constituted the tort of assault and battery under state law; (5) Defendants Morris, Woods, Oliveros, and McSpadden retaliated against Plaintiff for his prior misconduct against other prison officials and for his filing of a prior lawsuit and grievances; and (6) all Defendants engaged in a conspiracy to obstruct justice by submitting false documentation of what actually occurred in Plaintiff's cell. Id. at 9-12. As relief, Plaintiff requests a declaratory judgment in his favor; an injunction requiring the FDOC to take certain action; an award of compensatory and punitive damages; and any other relief deemed appropriate.  Id. at 20-23.

4

**B.  Defendants' Motion**

Defendants move for summary judgment in their favor for the following reasons: (1) "Plaintiff failed to prove a constitutional violation against the Defendants;" (2) "Defendants are entitled to qualified immunity;" and (3) "Plaintiff cannot obtain injunctions against non-parties." Motion at 1.  Regarding the claims of excessive force, Defendants rely on the video evidence which they contend "shows that they did not utilize excessive force on" Plaintiff. Id. at 9.  Defendants Hanson, McSpadden, and Oliveros argue they are entitled to summary judgment on Plaintiff's claims for failure to protect and intervene because there was no excessive force used.  Alternatively Defendants Hanson and McSpadden argue that even if excessive force was employed, they could not directly or clearly see what was happening in Plaintiff's cell, because "[t]he Alpha Team's bodies were in the way and blocked any view that Hanson and McSpadden might have had of Woods or Morris' excessive force." Id. at 12.  As to Plaintiff's claim of retaliation, Defendants assert that they were summoned to Plaintiff's cell because Plaintiff was unresponsive–not because they wanted to injure him based on his past misconduct. Id. at 13.  Defendants argue that Plaintiff "should not be allowed [to] proceed on a retaliation claim where he himself caused the Alpha Team to be assembled by appearing unresponsive, and then necessitated a use of force by resisting the Alpha Team when they attempted to restrain him." Id.  Additionally, Defendants argue they "are entitled to qualified immunity because their actions were reasonable and did not violate [Plaintiff's] constitutional rights." Id.  Finally, Defendants request that the claim for injunctive relief against the FDOC be dismissed because the FDOC is not a named party in this case. Id. at 16.

5

The video submitted shows Defendant Hanson giving a preliminary introduction of the events that had already transpired and he stated the names of the employees who were present, all of whom are Defendants except the camera operator.  Defendant Hanson remained outside of Plaintiff's cell during the time in which the A-Team was in Plaintiff's cell. Defendant McSpadden was responsible for opening Plaintiff's cell door, and he also remained outside of Plaintiff's cell.  Defendant Woods carried the protective shield into Plaintiff's cell and assisted in applying restraints to Plaintiff.  Defendant Morris was responsible for securing Plaintiff's right arm, and Defendant Oliveros was responsible for securing Plaintiff's left arm.  Defendants Porr and Anderson were responsible for controlling Plaintiff's right leg and left leg, respectively.

With the exception of Defendant Oliveros, all Defendants submitted Declarations in support of their positions.  Each declaration largely relays the same information, so the Court will not quote in detail each declaration.  In pertinent part, Defendant Hanson's Declaration states:

> On May 7, 2013, I worked in Q-dormitory at Florida State Prison.  Q-dormitory at Florida State Prison houses the "maximum management" inmates.  Buckman was a maximum management inmate at the time of the events described herein. In order to conduct a routine security check of the bars in [Buckman's] cell[,] . . . I requested that he submit to a strip search before being removed from his cell.  Conducting a strip search prior to removal from the cell is routine, in order to prevent staff contact with an inmate who may be in possession of a weapon or other dangerous materials.  Buckman refused to consent to a strip search, despite being ordered numerous times to do so.  When it became clear that Buckman would not comply with my orders, I left Buckman's cell-front in order to contact the Duty Warden to advise him of the situation.  When I reached the quarterdeck and attempted to contact the Duty Warden, Buckman began causing a disturbance by kicking the

6

door to his cell and yelling loudly.  Shortly thereafter, other inmates then began yelling "Man down, third floor."

I then went to Buckman's cell to investigate the claims of a fallen inmate.  Buckman was lying on his back, unresponsive, with his left hand under his body.  Knowing that inmates will sometimes feign an illness or injury, I ordered Buckman to get on his feet.  Because Buckman would not respond to any of my commands, I activated the Alpha One Response Team.  I also ordered a handheld camera to be present even though one was not required to be present.  I did this to protect the members of the Alpha One Response Team in the event that Buckman made any allegations against them.

Once the team assembled, we stood outside Buckman's cell, and looked inside to determine if Buckman had began moving and would respond to commands.  Because Buckman remained unresponsive, the Alpha Response Team prepared to enter the cell.  Because Buckman was still pretending to be unconscious, I had to send the Alpha Response Team into Buckman's cell.  I advised the Alpha One Response Team to use caution because I was familiar with an incident of Buckman head-butting a Lieutenant when at Florida State Prison.  I also advised the Alpha One Response Team to try to avoid force if at all possible because Buckman was unresponsive.

Upon the cell door being opened, the Alpha Response Team entered Buckman's cell.  Immediately after the team entered the cell, an altercation immediately took place between the staff members and Buckman.  Due to the size of the cell and the number of people now in the cell, I did not have a clear view of the use of force.  From what I could hear, upon entry to the cell, Buckman concluded his feigned unconsciousness and made an aggressive move towards the officers.  The officers struggled with Buckman, repeatedly ordering him to stop resisting to no avail.  At some point, the officers gained control of Buckman and turned him onto his stomach so that he could be handcuffed.  Buckman was then assisted to his feet and escorted out of the cell.

At no time did I order The Alpha Response Team to use physical force except the force necessary to restrain Buckman.  The team was assembled to check on the well-being of an unresponsive inmate.  Force became necessary when

7

Buckman exhibited violent and aggressive behavior toward the officers.  Once Buckman stopped resisting and was restrained, all force ceased.  I did not witness, nor do I have any reason to believe that a member of the Alpha Response Team used excessive force or assaulted Buckman.  I would never allow an officer to do so in my presence.  Had I observed Buckman being assaulted or excessive force being employed, I would have intervened.

Ex. C.

Defendant Woods filed the following Declaration in support of the Motion:

On May 7, 2013, while working at Florida State Prison, I was summoned to Q-Wing as ordered by Captain George Hanson.  When I arrived at Q-Dorm, I was advised that Antonio Buckman . . . refused to submit to a strip search so that he could be removed from his cell in order to check the security of the bars in his cell.  I was further advised that when Captain Hanson attempted to contact the Duty Warden to advise him of the situation, Buckman began causing a disturbance by kicking on his cell door and yelling.  Shortly thereafter, other inmates housed in Q-Dormitory began to yell "Man down, third floor."  I was informed that when Captain Hanson went back to Buckman's cell, Buckman was laying on his back, unresponsive, with his left hand under his body.  Buckman did not respond to Captain Hanson's orders to get on his feet.  At that point, Captain Hanson activated the Alpha One Response Team, which on that day, consisted of myself, Ronnie Morris, Jesse Oliveros, Kenneth Porr, and Jacob Anderson.  Officer Anthony Lombardi served as the camera operator.

Once the team assembled, we peered into Buckman's cell for signs of movement.  Because Buckman remained unresponsive, the Alpha Response Team prepared to enter the cell.  As is the typical procedure, I, as the first man to enter the cell, carried a shield so that Buckman could be controlled on the ground while officers secured him.  This is done to prevent inmates from assaulting staff members.  The shield is particularly important when dealing with inmates like Buckman who are aggressive, violent, and have a history of assaulting staff members.  Because Buckman remained unresponsive, Captain Hanson ordered Buckman's cell be opened.

8

Upon the cell door being opened, the Alpha Response Team entered Buckman's cell. As soon as we entered the cell, Buckman sat up which caused the shield to strike him in the mouth. Buckman was being violently aggressive and refused all orders to cease his behavior. I utilized the protective shield to force Buckman back on the floor. Buckman's left arm was under his body again, preventing us from determining whether or not there was a weapon in his possession. The Alpha Team members struggled to restrain Buckman's arms and legs due to his physical resistance. Sergeant Morris gained control of Buckman's right arm. Because Officer Oliveros was unsuccessful in his attempt to remove Buckman's left hand from under his body and control it, I delivered a distractionary hammerfist to Buckman's left shoulder. The hammerfist is a technique I was taught during training which is meant to distract the resisting inmate so that he can be restrained. After the hammerfist, Oliveros was able to gain control of Buckman's left arm. At that point, Oliveros, Morris, and I turned Buckman onto his stomach, he was handcuffed and his legs were shackled. We then assisted him to his feet and began escorting him out of the cell.

While exiting the cell, I placed my hand on the back of Buckman's head to prevent him from turning and spitting on staff members. Buckman was then escorted to medical for a post use of force physical.

The Alpha Response Team did not plan or intend to use physical force in dealing with Buckman. Force became necessary in order to stop Buckman's aggressive behavior and protect myself and my fellow officers. Once Buckman stopped resisting and was restrained, all force ceased. With the exception of the initial contact between Buckman's face and the shield, and the distractionary hammerfist to his shoulder, Buckman was not punched, kicked, or otherwise hit by any member of the Alpha Response Team, including myself.

Ex. G.

Defendant McSpadden's Declaration states as follows:

On May 7, 2013, I was assigned as the Shift Assistant OIC at FSP. On that date I was present on Q-Wing due to inmate Buckman . . . being unresponsive. I was present when

9

the Alpha One Response Team was assembled to apply restraints to Buckman. I opened Buckman's cell door to allow the Alpha One Response Team to enter and [apply] restraints to Buckman. I witnessed Buckman become violently aggressive. I also witnessed the members of the Alpha One Response Team utilize physical force to apply restraints to Buckman. I did not utilize any force.

Due to the size of the cell and the number of people now in the cell, I did not have a clear view of the entire use of force, however I did see enough to know that the officers did not use excessive force or violate Buckman's rights. From what I could hear, upon entry to the cell, Buckman made an aggressive move towards the officers. The officers struggled with Buckman, repeatedly ordering him to stop resisting to no avail. At some point, the officers gained control of Buckman and turned him onto his stomach so that he could be handcuffed. Buckman was then assisted to his feet and escorted out of the cell.

At no time did I order The Alpha Response Team to use physical force except the force necessary to restrain Buckman. The team was assembled to check on the well-being of an unresponsive inmate. Force became necessary when Buckman exhibited violent and aggressive behavior toward the officers. Once Buckman stopped resisting and was restrained, all force ceased. I did not witness, nor do I have any reason to believe that a member of the Alpha Response Team used excessive force or assaulted Buckman. I would not allow an officer to do so in my presence. Had I observed Buckman being assaulted or excessive force being employed, I would have intervened.

Doc. 61.

### C. Plaintiff's Response

Plaintiff largely reiterates the factual assertions made in his Amended Complaint. He avers that he was unconscious and that he never resisted the Defendants' attempts to restrain him. Response at 7. He explains why Defendants Morris, Woods, and Oliveros retaliated against him, and alleges that they said, "We finally got your bad a**, we told you

repeatedly that we were going to get you for head[]butting Lt. Sanders and all those times you've assaulted officers in this building." Id. at 3 (internal quotations omitted).  According to Plaintiff, Defendant Morris told him, "[Y]ou know I wasn't finished kicking you're a** from last year" and Defendant Morris explained to some of the other Defendants that Plaintiff had previously filed a lawsuit against Defendant Morris.  Id.  Plaintiff further alleges that Defendant McSpadden told Plaintiff that he let his officers beat Plaintiff "for all the grievances you've wrote [sic] against me . . . ." Id. (internal quotations omitted).

### III.  Standard of Review

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Hinkle v. Midland Credit Mgmt., Inc., No. 15-10398, 2016 WL 3672112, at *4 (11th Cir. July 11, 2016) (quoting Jurich v. Compass Marine, Inc., 764 F.3d 1302, 1304 (11th Cir. 2014)); see Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Hinkle, 2016 WL 3672112, at *4 (internal quotations and citation omitted).

> If the movant satisfies the burden of production showing that there is no genuine issue of fact, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008) (quotation omitted). [The Court] draw[s] "all factual inferences in a light most favorable to the non-moving party." Id.

Winborn v. Supreme Beverage Co. Inc., 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam).

When the parties "tell different versions of the same events, one of which is blatantly contradicted by the record–such that no reasonable jury could believe it–a court should not

adopt the contradicted allegations." <u>Logan v. Smith</u>, 439 F. App'x 798, 800 (11th Cir. 2011) (citing <u>Pourmoghani-Esfahani v. Gee</u>, 625 F.3d 1313, 1315 (11th Cir. 2010)).  "In the context of cases involving video evidence, th[e] Court will accept the video's depiction over the opposing party's account of the facts where the video <u>obviously contradicts</u> that version of the facts." <u>Id.</u> (citations omitted) (emphasis added).  However, "even where the entire series of events is recorded, video evidence is not obviously contradictory if it . . . fails to provide an unobstructed view of the events." <u>Id.</u> (citations omitted).

### IV.  Analysis

### A. Use of Excessive Force / Assault & Battery

Plaintiff claims that Defendants Morris, Woods, Anderson, Porr, and Oliveros used excessive force on him inside his cell.  The Eighth Amendment prohibits the infliction of cruel and unusual punishment.  U.S. Const. amend. VIII.  "[T]he core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992).  "If force is used 'maliciously and sadistically for the very purpose of causing harm,' then it necessarily shocks the conscience."  <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007) (per curiam) (quoting <u>Brown v. Smith</u>, 813 F.2d 1187, 1188 (11th Cir. 1987)).  Courts consider the following factors when analyzing whether force was used maliciously and sadistically:

> (1) "the extent of injury"; (2) "the need for application of force"; (3) "the relationship between that need and the amount of force used"; (4) "any efforts made to temper the severity of a forceful response"; and (5) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them."

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)).  "When considering these factors, [courts] 'give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance.'" Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam) (quoting Cockrell, 510 F.3d at 1311).

"The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Hudson, 503 U.S. at 9-10 (internal quotations and citations omitted).  Indeed, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  Id. at 9 (citation omitted). "While a lack of serious injury is relevant to the inquiry, '[i]njury and force . . . are only imperfectly correlated and it is the latter that ultimately counts.'" Smith v. Sec'y, Dep't of Corr., 524 F. App'x 511, 513 (11th Cir. 2013) (quoting Wilkins v. Gaddy, 559 U.S. 34, 38 (2010)).  "A prisoner may avoid summary judgment, 'only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain.'" Stallworth v. Tyson, 578 F. App'x 948, 953 (11th Cir. 2014) (quoting Brown, 813 F.2d at 1188).

This case brings into sharp focus the difficulty courts face in adjudicating excessive force cases in the prison setting.  However, unlike some other excessive force cases, both the Plaintiff prisoner and the Defendant prison guards agree that a physical confrontation occurred.  The medical records show that as a result of that confrontation, Plaintiff had "3 top front teeth missing [with] moderate gum bleeding"; an "abrasion on lower outside bottom

lip"; and a "laceration on lower inside lip."[4]  Ex. B at 9.  The video evidence shows Plaintiff was injured during the confrontation, as he can be seen leaving his cell with blood on his face and shirt.

From there, however, the parties' stories diverge.  Plaintiff says he was unconscious on the cell floor, that he never resisted, and that Defendants repeatedly and unnecessarily used force on him.  Defendants say that when they entered Plaintiff's cell to extract him, he resisted and they only used the amount of force required to subdue and restrain him.  If that was all we had, summary judgment likely would have to be denied.

But we have more: a videotape of the entire incident.  Why do we have a videotape?  Because, over time, many departments of corrections have decided that videotaping planned confrontations–such as cell extractions–make it more likely that prison guards, who know they are under the unsparing eye of the camera, will be more likely to conduct themselves according to the established protocol and less likely to use unnecessary or gratuitous force.  See Fla. Admin. Code r. 33-602.210 (describing uses of force and the department's obligations when force is used).  Also, the videotape documents exactly what happened, which either protects against unfounded excessive force claims or substantiates them.

Here, the video played its proper role.  The video begins with the shift supervisor (Defendant Hanson) describing the events leading up to that point.  He states the names of

_____

[4] While Plaintiff states in a conclusory fashion that his injuries were not accurately documented, see Response at 2, his list of physical injuries generally coincides with what is listed in the medical records.  Plaintiff does not describe injuries to any other part of his body other than his face.

the employees who were present, all of whom are Defendants except the camera operator. He then states, "Can't see what's in [Buckman's] left hand, I believe. So, use caution guys. Go in, apply the restraints, . . . try to avoid force if at all possible. He is unresponsive. Medical's in route."  The video then shows the other Defendants responding to their supervisor's orders.  It is reasonable to assume that Defendants knew that Q-dorm housed the maximum management inmates (Ex. C), and given Plaintiff's lengthy disciplinary history (Exs. E, G) and the fact that Defendants could not see if Plaintiff had a weapon in his hand, Defendants were rightly cautious but they followed their set protocol in a calm and professional manner.

Once the cell door was opened, the video shows the officers trying to restrain Plaintiff. Defendant Woods testified that as the first man to enter the cell, he employed a shield (which may have been the cause of Plaintiff's injuries) to help control the prisoner while others secured him: "The shield is particularly important when dealing with inmates like Buckman who are aggressive, violent, and have a history of assaulting staff members." Ex. G.  While it is true that the video camera cannot penetrate the scrum of officers while they are trying to get Plaintiff restrained, we can see the officers following a procedure, see the situation escalate briefly, with voices raised, and then see Plaintiff restrained and being pulled up to a standing position with blood on his face and shirt.  There are no obvious punches thrown (save the distractionary hammerfist to Plaintiff's shoulder area), kicking, or other violent movements by the officers.  The entire extraction from the opening of the cell door to the conclusion of the incident takes 58 seconds.  Plaintiff is then calmly escorted from the cell to receive medical attention.

The Eleventh Circuit has said that a video does not "obviously contradict" a plaintiff's version of events if it "fails to provide an unobstructed view of the events." Logan, 439 F. App'x at 800.  While we cannot see Plaintiff clearly (or sometimes at all) during the cell extraction (because the officers on the floor with Plaintiff were in the way of the camera), we can see the officers at all times.  I have now watched the video three times.  The video provides a sufficiently clear view of what happened to "obviously contradict" Plaintiff's version of events and to support that of the prison guards.

While it is unfortunate that Plaintiff was injured during this episode, I hold that no reasonable jury could find the officers used excessive force in this situation.  At bottom, this is just a "dispute over the reasonableness of the force used"; the evidence, even in the light most favorable to Plaintiff, does not "support a reliable inference of wantonness in the infliction of pain." Stallworth, 578 F. App'x at 953 (internal quotations omitted).  Thus, summary judgment in favor of Defendants on the use of excessive force claim is appropriate.

In light of the Court's finding that no excessive force was used, the Court further finds summary judgment to be appropriate on Plaintiff's corresponding state law assault and battery claim.  Although Defendants did not mention Plaintiff's assault and battery claim in their Motion for Summary Judgment, Plaintiff detailed his arguments in his Response and had the opportunity to submit all of his evidence in support of his claims.[5]  Indeed, Plaintiff

---

[5] As this Order disposes of all of Plaintiff's federal claims, the Court could dismiss Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.  However, the parties have litigated this case in this Court for more than three years, and in the interests of comity, judicial economy, convenience, and fairness, the Court finds it more appropriate to address the claim on the merits rather than simply dismiss it without prejudice.

requests summary judgment be entered in his favor on the assault and battery claim. Response at 16-17.  Therefore, Plaintiff was on sufficient notice that this claim would be addressed on summary judgment.

"Florida law defines an assault as an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril. And a battery is defined as the intentional infliction of a harmful or offensive contact upon the person of another." Gomez v. Lozano, 839 F. Supp. 2d 1309, 1322 (S.D. Fla. 2012) (internal quotations and citation omitted). There are times when correctional officers are required to use force against an inmate. Here, Plaintiff has failed to show that any of the Defendants used excessive force, acted unreasonably, or acted with any malicious intent to cause him harm. See generally Davis v. City of Leesburg, No. 5:12-cv-609-Oc-10PRL, 2014 WL 4926143, at *28 (M.D. Fla. Sept. 30, 2014) (unpublished) (finding that an officer did not use excessive force under a Fourth Amendment analysis and therefore the plaintiff's state law battery claim necessarily failed). Moreover, Defendants' actions do not support a finding of bad faith, malicious purpose, or wanton and willful disregard of human rights as required for individual liability under state law. See Fla. Stat. § 768.28(9)(a) ("No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort . . . in any action for any injury or damage suffered as a result of any act . . . in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.").

Therefore, Defendants are entitled to summary judgment on Plaintiff's assault and battery claim.

### B.  Failure to Protect and Intervene[6]

Plaintiff raises claims of failure to protect him from the use of excessive force and failure to intervene in that use of excessive force against Defendants Oliveros, Anderson, Porr, McSpadden, and Hanson.  As the Court has found that no excessive force was used, Plaintiff's failure to protect and failure to intervene claims fail, and summary judgment will enter in Defendants' favor on these claims.  See Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1357 (11th Cir. 2015) (finding that summary judgment is appropriate on a failure to intervene claim when no excessive force was used, because "a police officer has no duty to intervene in another officer's use of force when that use of force is not excessive"); Crenshaw v. Lister, 556 F.3d 1283, 1293-94 (11th Cir. 2009) (finding that a claim of failure to intervene in a use of excessive force cannot stand if no excessive force was used).

### C.  Retaliation

Plaintiff contends that Defendants Morris, Woods, Oliveros, and McSpadden retaliated against him during the cell extraction incident because of Plaintiff's prior misconduct against other prison officials and for his filing of a prior lawsuit and grievances. "'The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech.'"  O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir.

---

[6] In the Motion, Defendants only address legal authority regarding a claim for failure to protect.

2011) (per curiam) (quoting Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003)); see Thomas v. Evans, 880 F.2d 1235, 1242 (11th Cir. 1989) ("The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech."). To prevail on a First Amendment retaliation claim, a plaintiff must show: "(1) he engaged in constitutionally protected conduct; (2) the defendant's retaliatory act adversely affected the protected conduct; and (3) there is a causal connection between the retaliatory act and the adverse effect on the conduct." Smith v. Florida Dep't of Corr., 713 F.3d 1059, 1063 (11th Cir. 2013) (citation omitted). If the plaintiff can establish "that the protected conduct was a motivating factor behind the harm, the burden of production shifts to the defendant," who can only "prevail on summary judgment if [he] can show [he] would have taken the same action in the absence of the protected activity." Id. (citation omitted).

As to Plaintiff's claim of retaliation against Defendants Woods and Oliveros, he asserts they retaliated against him due to his past misconduct against other prison officials. See Amended Complaint at 11 (Plaintiff alleges: "Defendants Morris, Woods, and Oliveros [stated] that their reasons for kicking Plaintiff's a** was for his past misconduct of assaulting officers at [FSP]"). Plaintiff reiterates this in his Response. See Response at 14 (Defendants told him they would "get [him] for headbutting Lt. Sanders and all the times [he] assaulted officers in this building"). Plaintiff does not assert that Defendants Woods and Oliveros retaliated against him for any constitutionally protected conduct. Thus, his First Amendment retaliation claim against Defendants Woods and Oliveros fail, and summary judgment in their favor will be entered on this claim.

As to his retaliation claim against Defendants Morris and McSpadden, he asserts these Defendants retaliated against him during the cell extraction incident for his filing of a prior lawsuit against Morris[7] and grievances against McSpadden.  Response at 3, 14; see Amended Complaint at 11, 18.   Plaintiff argues "that he has demonstrated that his involvement in filing a civil rights suit against Defendant Morris and the filing of grievances against McSpadden" constituted protected activity for which these Defendants retaliated against him.  Response at 15.  The Court agrees that the filing of a lawsuit and grievances is protected conduct.  However, no retaliatory action was taken by these Defendants. Defendant Morris did not use excessive force on Plaintiff and Defendant McSpadden did not fail to protect Plaintiff from or fail to intervene in any use of excessive force.  Moreover, although Plaintiff claims that these Defendants retaliated against him based on his prior lawsuit and grievances, these Defendants would have taken the same actions (participating in the cell extraction) in the absence of Plaintiff's prior protected speech.  There is no dispute that the Defendants were required to enter Plaintiff's cell and remove him because he was unresponsive to commands.  Plaintiff has failed to establish a causal connection between the alleged retaliatory conduct and his protected speech.  Therefore, summary judgment is appropriate on the retaliation claim against Defendants Morris and McSpadden.

### D.  Conspiracy

Plaintiff asserts that Defendants "conspired to obstruct justice by creating false, misleading and inaccurate documents and reports to conceal the actual facts of why the

---

[7] To the extent Plaintiff asserts that Defendant Morris retaliated against him for his past misconduct against other prison officials, such a claim fails because Plaintiff's past misconduct is not a constitutional protected activity.

physical force was used against Plaintiff's natural body."   Amended Complaint at 12.

According to Plaintiff, these inaccurate reports impeded the inspector general's investigation

into this incident.   Id.   Defendants assert in the Motion that   "there is not one shred of

evidence that there was a conspiracy to harm Mr. Buckman."[8]   Motion at 7.   In the

Response, Plaintiff argues that Defendants violated state and federal law by creating false

reports of what occurred in his cell to frustrate the inspector general's investigation.[9]

Response at 17.

"[T]o prove a § 1983 conspiracy, the plaintiff 'must prove the defendants reached an

understanding' to violate his constitutional rights and committed 'an actionable wrong to

support the conspiracy.'"   Richards v. Dickens, 411 F. App'x 276, 279 (11th Cir. 2011)

(quoting Grider v. City of Auburn, 618 F.3d 1240, 1260 (11th Cir. 2010)); see Bendiburg v.

Dempsey, 909 F.2d 463, 468 (11th Cir. 1990) ("The conspiratorial acts must impinge upon

the federal right; the plaintiff must prove an actionable wrong to support the conspiracy.").

"For a conspiracy claim to survive a motion for summary judgment '[a] mere scintilla of

evidence . . . will not suffice; there must be enough of a showing that the jury could

---

[8] While Defendants do not expound upon their argument, Plaintiff details his arguments
in support of his claim in the Response, and he requests that summary judgment be entered
in his favor on the conspiracy claim.  Response at 17.  The Court finds that Plaintiff was on
sufficient notice that this claim would be adjudicated on summary judgment and Plaintiff
suffers no prejudice because he had the opportunity to present his evidence and argue his
position regarding this claim.

[9] Also in Plaintiff's Response, he cites United States v. Fontenot, 611 F.3d 734 (2010),
which is a criminal case discussing 18 U.S.C. § 1519, a criminal statute entitled,
"Destruction, alteration, or falsification of records in Federal investigations and bankruptcy."
This legal authority does not support Plaintiff's conspiracy claim in this civil rights case.  To
the extent Plaintiff seeks to impose criminal liability on any of the Defendants, he has no
authority to do so.

reasonably find for that party.'" Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1284 (11th Cir. 2002) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).

Plaintiff has not set forth any evidence beyond his own conclusory allegations that Defendants had an agreement to deprive him of his constitutional rights or that Defendants committed an actionable wrong. The Court's finding that no excessive force was used belies Plaintiff's claim that Defendants covered up any use of excessive force by completing false incident and disciplinary reports. Defendants could not have conspired to cover up an act that did not occur. Accordingly, no jury could reasonably find for Plaintiff on this claim; the Court therefore grants summary judgment in favor of Defendants on Plaintiff's conspiracy claim.

### E. Qualified Immunity

In the Motion, Defendants argue they "are entitled to qualified immunity from suit." Motion at 15. The Eleventh Circuit has said:

> To receive qualified immunity, [a] public official must establish that he was engaged in a "discretionary function" at the time he committed the allegedly unlawful act. If the official demonstrates that he was engaged in a discretionary function, the burden shifts to the plaintiff to prove that the official is not entitled to qualified immunity. This requires [a] plaintiff to satisfy the two-part test prescribed by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001). Under Saucier, [the] plaintiff must first show that the defendant violated a constitutional right and then demonstrate that the constitutional right was clearly established at the time of the alleged wrongful act. If a court, after viewing all the evidence in the light most favorable to the plaintiff and drawing all inferences in his favor, determines that the plaintiff has satisfied these two requirements, the defendant may not obtain qualified immunity.

Bryant v. Jones, 575 F.3d 1281, 1295 (11th Cir. 2009) (citations omitted).  Following the United States Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223, 236 (2009), this Court is "free to consider these elements in either sequence and to decide the case on the basis of either element that is not demonstrated."  Youmans v. Gagnon, 626 F.3d 557, 562 (11th Cir. 2010) (per curiam) (citation omitted).  Because the Court has found that there was no constitutional violation with respect to Plaintiff's excessive force, failure to protect and intervene, retaliation, and conspiracy claims, Defendants are entitled to qualified immunity on those claims.

### F. Injunctive Relief Request against FDOC

Plaintiff requests that the Court issue an injunction requiring the FDOC to take certain actions.  See Amended Complaint at 21-22.  The FDOC is not a party to this case.  Therefore, Plaintiff's request for injunctive relief against the FDOC is due to be dismissed.  See In re Infant Formula Antitrust Litig., MDL 878 v. Abbott Labs., 72 F.3d 842 (11th Cir. 1995); Merritt v. Godfrey, No. 3:13cv607/LAC/EMT, 2015 WL 5439306, at *9 (N.D. Fla. Aug. 10, 2015), report and recommendation adopted, 2015 WL 5440570 (Sept. 19, 2015) (dismissing a claim for injunctive relief against the FDOC when the FDOC was not named as a party in the case).

Accordingly, it is

**ORDERED:**

1.   Defendants' Motion for Summary Judgment (Doc. 42) is **GRANTED**.

2.   To the extent Plaintiff seeks entry of summary judgment in his favor, see Response, his request is **DENIED**.

3.     The Clerk of Court shall enter judgment in favor of Defendants and against Plaintiff and thereafter close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 8th day of September, 2016.

_____
TIMOTHY J. CORRIGAN
United States District Judge

cr 9/8
c:
Antonio Buckman, #Q09285
Counsel of Record